George Haines (NJ SBN 032111999)    Joshua B. Swigart (CA SBN 225557)
ghaines@freedomlegalteam.com    Josh@SwigartLawGroup.com
**FREEDOM LAW FIRM**    **SWIGART LAW GROUP, APC**
One Gateway Center, Suite 2600    2221 Camino del Rio S, Ste 308
Newark, NJ 07102    San Diego, CA 92108
P: 702-880-5554 ext. 222    P: 866-219-3343
F: 702-967-6666    F: 866-219-8344
    *Will Apply for Pro Hac Vice*

*Attorneys for Plaintiff and*
*The Proposed Class*

# UNITED STATES DISTRICT COURT

## DISTRICT OF STATE OF NEW JERSEY

| | |
|---|---|
| **CASSANDRA VALERIE BEAMAN, individually and on behalf of others similarly situated,** | Case No. |
| **Plaintiff,** | **CLASS ACTION** |
| **vs.** | **COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| **BANK OF AMERICA, N.A.,** | |
| **Defendant.** | |

CLASS COMPLAINT

Cassandra Valerie Beaman ("Plaintiff"), individually and on behalf of all others similarly situated as New Jersey residents ("Class Members"), brings this action against Bank of America, N.A. ("Bank of America," "Bank" or "Defendant") for violations of the Electronic Funds Transfer Act at 15 U.S.C. §§1693 et seq. ("EFTA") and its implementing regulations at 12 C.F.R. Part 1005 ("Regulation E"), breach of contract, negligence, and other state common law and statutory claims, to remedy Bank of America's egregious maladministration of its obligations under the New Jersey Department of Labor & Workforce ("LWD") benefits payment programs. In violation of its constitutional, statutory, common law, and contractual obligations to Plaintiff and Class Members, the Bank has failed to take reasonable steps to protect Plaintiff and Class Members' benefits from fraud, has deprived them of their statutory right to public benefits without providing them with notice or an opportunity to be heard, and has otherwise failed to ensure that they are able to receive and access the public benefits to which they are lawfully entitled.

## I.    INTRODUCTION

1.    Like millions of other Americans, Plaintiff and Class Members lost their jobs through no fault of their own during the COVID-19 pandemic. Plaintiff and Class Members applied for unemployment and other public benefits through programs administered by New Jersey Department of Labor & Workforce ("LWD"). They were found eligible by LWD to receive, and initially did receive, the benefits to which they were and are lawfully entitled. Throughout the COVID-19 pandemic, Plaintiff and Class Members have relied on these subsistence benefits to pay for food, housing, and other necessities of life.

2.    Pursuant to an exclusive contract between LWD and Bank of America, Plaintiff and Class Members received their periodic benefits payments not from LWD directly, but through Bank-issued and Bank-administered prepaid debit cards ("LWD Debit Cards" or "Cards"), which are linked to individual Bank depository accounts ("LWD Debit Card Accounts" or "Accounts"). Although the Bank was

entrusted with administering these critical LWD Benefits, on which millions of vulnerable Americans' lives depend, and although the Bank was legally required to take necessary and reasonable steps to protect Plaintiff's and Class Members' LWD Debit Cards and Accounts from fraudulent access by third parties, the Bank failed to do so and indeed treated these Cards and Accounts with *less* care than it affords its regular consumer debit and credit cardholders. Among other things, the Bank failed to secure Plaintiff's and Class Members' sensitive Card and Account information and issued her a LWD Debit Card without the industry-standard, fraud-preventing EMV chip technology that the Bank has used on all its *regular consumer* customers' debit and credit cards since 2014. Instead, for its *government benefits* customers, the Bank chose to issue debit cards with only outdated magnetic stripe technology, which makes those cards far more susceptible to skimming, cloning, and other schemes that have allowed third parties to fraudulently use and access Plaintiff's and Class Members' LWD Debit Cards and Accounts. The Bank further breached its duties through its systemic practice of failing to take reasonable steps to secure Plaintiff's and Class Members' personal and financial information, including failing to ensure that this information was appropriately handled and not misappropriated by the Bank's subcontractors and their employees and agents, including by customer service representatives and other call center agents. The Bank's systemically lax security practices enabled unauthorized persons to access Plaintiff's and Class Members' personal and financial information and to make fraudulent, unauthorized transactions involving Plaintiff's and Class Members' LWD Debit Cards and Accounts.

3.     In addition to the Bank acting negligently and in breach of its statutory and common law obligations to Plaintiff and Class Members by failing to protect their LWD Debit Cards and Accounts, the Bank also has violated its statutory and common law obligations to Plaintiff and Class Members by failing to implement adequate and reasonable systems, measures, and protections to permit: prompt and

effective identification of fraud on Plaintiff's and Class Members' Cards and Accounts, prompt submission of fraud claims (also referred to herein as unauthorized transaction claims), provisional access to already-approved benefits during the course of the Bank's investigations of fraud claims, prompt and accurate resolution of those claims, and prompt reimbursement of funds stolen from Plaintiff's and Class Members' Accounts. For example, instead of providing an effective and timely process for Plaintiff and Class Members to report fraud claims, the Bank adopted a series of "customer service" practices and policies that have required Plaintiff and Class Members to spend dozens of hours on the phone with customer service, and that have otherwise frustrated and obstructed Plaintiff's and Class Members' efforts to submit such claims. When those Plaintiff and Class Members who persevered were finally able to reach the Bank's customer service representatives to report that unauthorized transactions had fraudulently been conducted on their LWD Debit Card Accounts, the Bank then violated their statutory, common law, and constitutional due process rights by denying their fraud claims without investigation or explanation and freezing their Accounts indefinitely, thereby depriving them of access to their past *and future* disbursements of LWD benefits without any prior notice or an opportunity to be heard.

4.    The cardholder agreement between Bank of America and each Plaintiff and Class Member ("Cardholder Agreement") sets forth the Bank's "Zero Liability" policy, which promises to protect each Plaintiff and Class Member from adverse financial consequences if their LWD Debit Cards or Accounts are fraudulently used or accessed by third parties. The Bank has not implemented this policy as promised, which has caused Plaintiff and Class Members to suffer significant financial losses from third-party fraud, including by the Bank failing to have reasonable procedures in place to identify and receive notifications of fraud, failing to adequately monitor its customer service, establishing procedures that frustrate and obstruct timely submission of fraud claims by Plaintiff and Class Members, closing fraud claim

investigations without having conducted a reasonable investigation, and failing to extend provisional credit to Plaintiff and Class Members as required by law while fraud claim investigations are underway. The Bank has also deprived Plaintiff and Class Members of their constitutional rights to notice and an opportunity to be heard before causing their LWD Debit Cards and Accounts to be frozen or blocked for extended periods of time, thereby depriving Plaintiff and Class Members of access to past, present, and future disbursements of unemployment and other government benefits for which they have been found eligible.

5. By the acts and omissions alleged here, Bank of America has violated federal and state constitutional due process protections; violated EFTA and its implementing Regulation E; acted negligently; and breached its Cardholder Agreement with Plaintiff and Class Members, its contract with LWD (to which Plaintiff and Class Members are intended third-party beneficiaries), the implied covenant of good faith and fair dealing under those contracts, and its fiduciary duties to Plaintiff and Class Members. These acts and omissions have caused substantial financial and other harm to Plaintiff and Class Members, and unless promptly enjoined will cause them and the public to suffer immediate and irreparable harm.

## II.    JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to: (a) 28 U.S.C. §1331 because this action arises under the federal Due Process Clause and the Electronic Fund Transfers Act, 15 U.S.C. §§1693 et seq.; (b) 28 U.S.C. §1332(d) because this is a class action in which the amount in controversy exceeds $5,000,000, there are more than 100 putative Class Members, and the majority of putative Class Members are citizens of a state different than the state of which Bank of America is a citizen; (c) 28 U.S.C. §1332(a) because Plaintiff and Class Members are citizens of New Jersey, Bank of America is incorporated under the laws of Delaware and has its principal place of business in North Carolina, and the amount

1    in controversy exceeds $75,000; and (d) supplemental jurisdiction under 28 U.S.C.

2    §1367 with respect to the claims for relief arising under state law.

3         7.    This Court has specific personal jurisdiction over Bank of America

4    because the Bank has sufficient minimum contacts with New Jersey, has purposely

5    availed itself of the benefits and protection of New Jersey law, and conducts a

6    substantial amount of business in and with the State of New Jersey (including with

7    LWD), such that the Court's exercise of personal jurisdiction over the Bank is

8    reasonable and accords with due process.

9         8.    Venue is proper in this District pursuant to 28 U.S.C. §1391, because

10   Plaintiff resides in this District, a substantial portion of the acts or omissions giving

11   rise to the claims alleged occurred in this District, and because Bank of America is

12   subject to the Court's personal jurisdiction with respect to this action.

13        **III.   THE PARTIES**

14   **A.   Class Representative Plaintiff**

15        9.    Class Representative Plaintiff Cassandra Valerie Beaman resides in

16   East Orange, New Jersey. Plaintiff qualified for, and received, LWD benefits in the

17   State of New Jersey, and those benefits were delivered to Plaintiff through Bank of

18   America. Plaintiff received her LWD benefits through a Bank of America account

19   and was issued a Bank of America LWD Debit Card.

20   **B.   Defendant**

21        10.    Defendant Bank of America, N.A., is a financial institution

22   incorporated in the State of Delaware and headquartered in North Carolina that

23   conducts a substantial amount of business in New Jersey, including pursuant to its

24   exclusive contract with the State of New Jersey LWD to administer unemployment

25   benefits and other benefit payments through LWD Debit Cards and Accounts.

26        11.    Plaintiff and Class Members allege that at all times relevant to the

27   events giving rise to this action, each and every Defendant was acting as an agent

28   or employee of each of the other Defendants. Plaintiff and Class members further

1  allege that at all times relevant to those events, each and every Defendant was acting
2  within the course and scope of that agency or employment at the direction of or with
3  the full knowledge, permission, or consent of each and every other Defendant. In
4  addition, each of the acts or omissions of each and every Defendant was made
5  known to, and ratified by, each of the other Defendants.

6                          **IV.    FACTUAL ALLEGATIONS**

7  **A.    The Bank's Contract with LWD**

8          12.    LWD is an agency of the State of New Jersey that is responsible for
9  administering numerous benefits programs for low-income, unemployed, and other
10  New Jerseyans, including programs providing LWD Benefits, such as
11  unemployment insurance ("UI") benefits, pandemic unemployment assistance
12  ("PUA") benefits, pandemic emergency unemployment compensation benefits,
13  disability insurance benefits, and paid family leave benefits, to New Jersey.

14          13.    On information and belief, prior to 2020 Bank of America entered into
15  a contract with LWD to provide certain services, including issuance of Bank of
16  America LWD Debit Cards through which individuals entitled to receive LWD
17  benefits could access those benefits.

18          14.    On information and belief, Bank of America obtained that contract in
19  part by falsely representing to LWD that it would provide "best-in-class" fraud
20  monitoring.

21          15.    On information and belief, continuing in to 2020 and beyond LWD
22  began distributing LWD benefits pursuant to its contract with Bank of America,
23  under which the default means of distributing LWD benefits payments has been
24  through Bank-issued and Bank-administered LWD Debit Cards, rather than paper
25  checks or other forms of payment.

26          16.    On information and belief, the agreement Bank of America had with
27  New Jersey Department of Labor & Workforce included the representations that it
28  would fully protect LWD Debit Cardholders in case they became victims of fraud.

1   Specifically, the Bank represented that it would comply with all EFTA and
2   Regulation E requirements and timelines with respect to error resolution and it
3   provided assurance that its LWD Debit Cardholders (which includes) "should feel
4   comfortable in dealing with disputed transactions knowing that we extend our Zero
5   Liability protection on disputed claims, including ATM and pinned POS [point-of-
6   sale] transactions." The Bank described its error resolution process as follows: "A
7   Claimant can file a dispute by calling the Customer Service Center for complete
8   instructions. . .. After selecting the 'dispute a transaction' option within our IVR
9   [Interactive Voice Response], the cardholder will immediately speak with a live
10  representative who will further review the transaction and any other possible
11  fraudulent transactions with the cardholder. . .. Once a dispute is requested in our
12  system, a case will be created within our claims tracking system and tracked until
13  final resolution. Per Regulation E, within 10 business days of the initial dispute, we
14  will promptly correct the error. . .. If more time is needed, we will temporarily credit
15  the cardholder's account within 10 business days of the initiated dispute for the full
16  disputed amount. There is no limitation or maximum to the credit amount provided.
17  This will allow the account holder to use the funds while the claim is being
18  resolved."

19       17.    On information and belief LWD entered into a contract with Bank of
20  America because of and in reliance on Bank of America's representations above.

21       18.    LWD Debit Cards and Accounts are an integral part of LWD's benefits
22  distribution and administration system. Under the terms of the LWD-Bank
23  Contract, those Accounts can only receive deposits from the LWD and do not allow
24  commingling of benefits payments with other funds. The LWD-Bank Contract
25  provides that the Bank "shall disburse to each claimant the entire amount the LWD
26  authorizes" and "shall process all benefit payment amounts provided by the LWD
27  without alteration or adjustment."

28  **B.    The Bank's Failure to Secure LWD Debit Cardholder Information**

19. Bank of America has failed to store, share, transmit, or otherwise use LWD Debit Cardholders' personally identifiable information, Card and Account information, and other financial data and information, including any such data or information learned in the course of providing customer service to Cardholders (collectively, "Cardholder Information") in a reasonably secure manner and consistent with the Bank's obligations to LWD and to Plaintiff and Class Members. The Bank has also failed to act reasonably in its hiring, supervision, training, and retention of its agents, including its subcontractors and its subcontractors' employees and agents, who have access to Cardholder Information, including as a result of staffing the Bank's Call Centers, interacting with Cardholders, and reviewing Cardholders' unauthorized transaction claims. The Bank has failed to take reasonable steps to ensure that its subcontractors and their employees and agents, including CSRs and other Call Center agents, maintain the security and confidentiality of Cardholder Information, including by failing to ensure: that all such agents were subject to reasonable background checks, that all such agents received reasonable training on maintaining the security and confidentiality of Cardholder Information, and that the Bank's subcontractors took reasonable steps to secure Cardholder Information from unnecessary or unauthorized access, disclosure, and exfiltration, including by the subcontractors' agents and employees.

20. As a result of the Bank's acts and omissions alleged herein, Cardholder Information has been obtained by unauthorized third parties in a series of security breaches that have allowed Plaintiff's and Class Members' benefits to be stolen out of their Accounts through unauthorized transactions. The Bank's repeated and ongoing failure to secure Plaintiff's and Class Members' Cardholder Information violated and continues to violate the Gramm-Leach-Bliley Act and rules and regulations promulgated thereunder requiring the Bank to ensure the security of their customers' personal and financial information, and the Bank's common law duty to take reasonable steps to protect Cardholder Information from unauthorized

1  access, disclosure, and exfiltration, including by the Bank's own agents.

2      21.    Some LWD Debit Cardholders who have had money stolen from their

3  Debit Card Accounts through unauthorized transactions received and activated their

4  LWD Debit Cards, but never used their Cards. Such unauthorized transactions

5  could only have occurred if the Bank failed to store, share, transmit, or otherwise

6  use Cardholder Information in a reasonably secure manner.

7  **C.    The Bank's Use of Outdated, Vulnerable Magnetic Stripe Technology**

8      22.    When a debit or credit cardholder seeks to access funds on the card,

9  for example at a point-of-sale terminal or ATM, the Cardholder Information stored

10  on the card is first sent through a processing network operated by Visa. The first

11  step in that process occurs at the point of sale, where the card must either be swiped

12  or inserted into a card reader. The reader obtains the Cardholder Information stored

13  on the card and transmits it to the financial services provider through a computer

14  network, either at the time of the transaction or later in a "batch" with other

15  transactions.

16      23.    From the 1960s until approximately 10 years ago, magnetic stripes

17  were the standard for storing consumer information on debit cards and credit cards

18  in the United States. A magnetic stripe contains static data about the card, including

19  the cardholder's name, the card number, and the card expiration date. This data is

20  printed directly on the outside of the card and recorded on the magnetic stripe. When

21  swiped through a reader, this data is collected and transmitted as part of the

22  transaction process.

23      24.    Because the data on a magnetic stripe are static and easily readable,

24  magnetic stripe cards are highly susceptible to fraud. One of several common

25  methods of stealing information from magnetic stripe cards is called "skimming,"

26  a process by which a wireless transmitter affixed to a card reader collects the

27  information on the magnetic stripe when the card is swiped or inserted and sends it

28  to a nearby computer. The recipient can then use the information to clone the

1    consumer's card, conduct unauthorized transactions, and access the bank account
2    connected to the card.

3        25.    Personal data on magnetic stripe cards can also be captured by hackers
4    on a large scale. For example, in 2013, hackers infiltrated the retailer Target's
5    payment terminals and systematically captured the information of every swiped
6    card for weeks, ultimately gathering the card information of tens of millions of
7    people.[1] Card data collected in this manner can be sold on an underground market,
8    where the stolen data can be used to make fraudulent purchases.

9        26.    Over the past decade, in an effort to stem the consumer fraud enabled
10   by magnetic stripes, the financial services industry in the United States has adopted
11   EMV chip technology as the industry standard. While magnetic stripes are "static,"
12   with the same card-identifying information provided for every transaction, EMV
13   chips are "dynamic," meaning the data they contain can be interacted with, altered,
14   and updated. An EMV chip creates a unique electronic signature for each
15   transaction, making data from past EMV chip card purchases useless to would-be
16   thieves, thereby significantly reducing the risk of unauthorized transactions.

17       27.    In 2011, the same year the Bank began issuing LWD Debit Cards, the
18   Bank announced it would offer EMV chips in corporate credit cards to its U.S.
19   business customers who regularly traveled outside the United States.

20       28.    On September 30, 2014, the Bank announced that it would include
21   EMV chip technology on "all new and reissued" consumer debit cards. In
22   announcing this shift, a Bank of America executive stated that "chip technology is
23   an important tool in increasing card security, and we want our customers to have
24   the best possible experience when using their payment cards." The executive added

25

26       [1] Elise Hu, "Target Hack a Tipping Point in Moving Away from Magnetic
     Stripes," *NPR* (Jan. 23, 2014), *available at* https://www.npr.org/sections
27   /alltechconsidered/2014/01/23/264910138/target-hack-a-tipping-point-in-moving-
28   away-from-magnetic-stripes.

1    that the "new chip-enabled cards will improve security of customers' transactions."[2]

2        29.    In 2015, card issuers and processors began a nationwide shift to EMV

3    chip cards. By 2017, an estimated 855 million EMV chip cards had been issued to

4    U.S. consumers, and such cards are now standard in the industry.

5        30.    In 2015, card-issuing banks and payment networks introduced a new

6    policy that shifted liability for fraudulent transactions away from themselves and

7    onto retailers and card issuers. As of October 1, 2015, retail merchants who did not

8    have certified EMV chip readers became liable for fraudulent transactions if the

9    consumer presented an EMV chip card. In essence, this meant that liability for

10    consumer card fraud would fall on either the retailer or the card issuer, whichever

11    was the least compliant with the EMV protocol.

12        31.    Bank of America acknowledges on its website that EMV chip

13    technology "has been around for over 20 years and is the credit and debit card

14    security standard in many countries around the world. When purchases are made

15    using the chip feature at chip-enabled terminals, the transaction is more secure

16    because of the process used to determine if the card is authentic. This makes the

17    card more difficult to counterfeit or copy." The Bank also assures Cardholders on

18    its website that "whether you use the magnetic stripe or the chip to make your

19    purchase, you can have confidence in the protection and security features we

20    provide for all credit and debit accounts."

21        32.    Bank of America has been aware for many years that EMV chip cards

22    are significantly more secure than magnetic stripe cards and that EMV chip cards

23    are the "debit card security standard." Despite that knowledge and despite the

24    Bank's representations to LWD that it will "focus on claimants" while leveraging

25    "rapidly evolving payment technology" and staying "at the forefront of payments

26    
27        [2] Bank of America Press Release, "Bank of America Begins Rollout of Chip Debit Cards" (Sept. 30, 2014), *BusinessWire*, available *at* https://www.businesswire.com/news/home/20140930005292/en/Bank-of-America-Begins-Rollout-of-Chip-Debit-Cards.

28

innovation," the Bank chose to issue LWD Debit Cards using old, vulnerable magnetic stripe technology to hundreds of thousands of the most financially vulnerable New Jerseyans —Plaintiff and Class Members. To this day, the Bank continues to issue LWD Debit Cards with no EMV chip, notwithstanding its announcement nearly seven years ago that it would include EMV chip technology on all consumer debit cards to help prevent fraud. Predictably, the issuance of LWD Debit Cards without EMV chips has led to rampant fraud, resulting in the ongoing loss of millions of dollars in LWD benefits intended to assist New Jerseyans who lost their jobs, including during the COVID-19 pandemic.

**D.    The Bank's Contractual Promises and Representations to Cardholders**

33.    Bank of America represented to Plaintiff and Class Members, in its Cardholder Agreement and on its website, that they would not be responsible for unauthorized transactions on their LWD Debit Cards or Accounts because of the Bank's "Zero Liability" policy, under which the Bank would fully protect them against, and would reimburse them for, any unauthorized transactions. The Bank also represented to Plaintiff and Class Members that they could call the Bank 24 hours a day 7 days a week to report any unauthorized transaction to live customer services representatives, and that the Bank would promptly investigate the transaction and determine whether it was unauthorized within 10 business days thereafter, except that if the Bank took longer than 10 business days (but in no event longer than 45 calendar days) to investigate the transaction, the Bank "will credit your Account within 10 business days for the amount you think is in error, so that you will have the money during the time it takes us to complete our investigation."

34.    On information and belief, the Bank's agreement with New Jersey Department of Labor & Workforce which governs the handling of the debit cards, to which all LWD Debit Cardholders must agree, Bank of America sets forth the above promises in detail. These cardholder agreements were effective at the time Plaintiff received her benefits and thus has been effective throughout all claims

made by Plaintiff.  The agreement with Bank of America provided for zero liability for the card holder in the case of fraud.

**E.    The Rampant Third-Party Fraud on LWD Debit Card Accounts**

35.    In the spring of 2020, the COVID-19 pandemic devastated New Jersey's economy, and hundreds of thousands of workers lost their jobs due to business closures and mass layoffs. The state's unemployment rate skyrocketed to heights not seen in 44 years following closure orders[3].  Industries such as hospitality, food service, retail trade, and educational services were especially hard hit.

36.    As a result, thousands of New Jerseyans turned to the LWD unemployment benefits programs administered by Bank of America to pay their bills and make ends meet. Since the start of the COVID-19 pandemic in March 2020, LWD has received over 200 thousand claims for various unemployment benefits. Bank of America has issued thousands of LWD Debit Cards to individuals found by LWD to be eligible for unemployment benefits.

37.    Tens of thousands of LWD Debit Cardholders have been the victims of fraud throughout the pandemic, resulting in tens of millions of dollars having been stolen from their Accounts, including through fraudulent ATM withdrawals, such as Plaintiff and Class Members have experienced.

38.    LWD Debit Cardholders have reported thousands of dollars stolen through unauthorized use of their LWD Debit Cards. These unauthorized transactions have taken various forms, including massive ATM withdrawals in distant states and countries,[4] thousand-dollar charges at luxury vendors, and

---

[3] The Post and Courier, *SC Posted Its Highest Unemployment Rate In At Least 44 Years Due To The Pandemic*; https://www.postandcourier.com/health/covid19/sc-posted-its-highest-unemployment-rate-in-at-least-44-years-due-to-pandemic/article_2abebbea-9c2e-11ea-9553-cbb3fe0e5f5e.html

[4] *See, e.g.*, CBSLA Staff, "Bank of America Freezes LWD Accounts of Nearly 350,000 Unemployed Californians for Suspected Fraud," *CBS Los Angeles* (Oct. 29, 2020), *available at* https://losangeles.cbslocal.com/2020/10/29/bank-of-

repeated transactions with food delivery services. Regardless of how or where the fraud has been carried out, the Bank's LWD Debit Cards have proven highly susceptible to unauthorized use.

39.    After criminals exploit the security vulnerabilities of the Bank's LWD Debit Cards and Accounts and misappropriate Cardholder Information, that information can be sold on the dark web, allowing the buyers to engage in unauthorized use of funds belonging to Plaintiff and Class Members.[5]

40.    Such rampant third-party fraud was readily foreseeable given the rapid growth of the number of new unemployment benefits claims, as well as reports from early in the pandemic warning of the potential for fraud and exploitation of the unemployment benefits system by criminals. It is well known in the financial industry that crises such as economic recessions lead to an increase in scams, fraud, and other financial crimes. The early months of the COVID-19 pandemic in the United States—March through May 2020—made clear that the pandemic would be no exception. In late March 2020, the federal Coronavirus Aid, Relief, and Economic Security (CARES) Act was signed into law, injecting $2.2 trillion of relief into the American economy, including $260 billion in increased unemployment benefits, and hundreds of billions of dollars more in one-time cash payments to taxpayers and forgivable Paycheck Protection Program ("PPP") loans. This rapid influx of pandemic relief to individuals and businesses, combined with rapid growth in the number of new claims for UI, PUA, and other public benefits created a "perfect environment" for fraud that was widely reported in the American media,[6] and that led to a flood of warnings from government agencies and expert

america-freezes-edd-accounts-of-nearly-350000-unemployed-californians-for-suspected-fraud/.

[5] *See id.*

[6] Ari Shapiro & Martin Kaste, "The Pandemic Creates A Perfect Environment For New Types Of Fraud," *NPR All Things Considered* (May 21, 2020), https://www.npr.org/2020/05/21/860584461/the-pandemic-creates-a-perfect-

nongovernmental organizations about major increases in malicious cyber activity and financial fraud, including fraud targeting government unemployment benefits and consumer banking and credit services.[7] Reporting during the early months of the pandemic also noted the major increases in fraudulent financial activity had, predictably, caused a corresponding increase in demand on customer service phone lines, causing many agencies and companies to hire additional customer service

environment-for-new-types-of-fraud (reporting experts saying that there was a "bonanza" and "gold rush right now" in pandemic-related financial crimes); Steve Inskeep & Martin Kaste, *Washington State Hit Hard by Unemployment Fraud*, *NPR Morning Edition* (May 22, 2020) ("scams thriving nationwide in the uncertain conditions created by the pandemic," including hundreds of millions of dollars lost by Washington state to fraudulent unemployment claims).

[7] *See, e.g.*, National Governor's Association, *Memorandum To: All Governors Re: COVID-19 and Cybersecurity* at 1 (Apr. 28, 2020) ("State agencies, critical infrastructure sectors, and the general public are experiencing waves of COVID-themed malicious cyber activity."); Greg Iacurci, "If there's coronavirus relief money, scammers will try and steal it," *CNBC* (May 6, 2020), https://www.cnbc.com/2020/05/06/scammers-are-looking-to-steal-your-coronavirus-relief-money.html ("Federal agencies like the IRS, Federal Trade Commission, Social Security Administration and FBI have warned consumers and business owners in recent weeks to be vigilant as fraudsters try to take advantage of them during the coronavirus pandemic," including by targeting government financial relief such as unemployment benefits); U.S. Dept. of Labor Press Release, *U.S. Department Of Labor Issues Guidance And Reminders To States To Ensure Integrity Of Unemployment Insurance Programs* (May 11, 2020), https://www.dol.gov/newsroom/releases/eta/eta20200511-1 (announcing new "targeted guidance and reminders . . . to help states guard against fraud and abuse of their unemployment insurance systems"); Mike Baker, "Feds Suspect Vast Fraud Network Is Targeting U.S. Unemployment Systems," *The New York Times* (May 16, 2020), *available at* https://www.nytimes.com/2020/05/16/us/coronavirus-unemployment-fraud-secret-service-washington.html; AnnaMaria Andriotis & Orla McCaffrey, "Borrower, Beware: Credit-Card Fraud Attempts Rise During the Coronavirus Crisis," *The Wall Street Journal* (May 27, 2020), *available at* https://www.wsj.com/articles/borrower-beware-credit-card-fraud-attempts-rise-during-the-coronavirus-crisis-11590571800 (reporting on the "big jump in attempted credit- and debit-card fraud since coronavirus shut down the U.S. economy" and that "[b]anks have increased their fraud projections for 2020").

1  representatives.[8] Bank of America nonetheless failed to take reasonable measures
2  to prepare for, prevent, or respond to the readily foreseeable transactional fraud as
3  relates to its LWD Debit Cards and Accounts.

4  **F.  The Bank's Evasive and Ineffectual Response Prior to the Filing of**
5  **Plaintiff's Initial Class Action Complaint**

6      41.    Bank of America's ineffective response to the rampant fraud has taken
7  various forms, as detailed herein, including failing to employ reasonable procedures
8  for monitoring, detecting, stopping, and notifying Plaintiff and Class Members
9  about highly suspicious transactions in their Accounts; not answering the customer
10 service phone lines it advises LWD Debit Cardholders to call; establishing
11 "customer service" procedures that frustrate and obstruct Plaintiff's and Class
12 Members' efforts to file fraud claims; opening fraud claims and then promptly
13 closing them without conducting a reasonable and good faith investigation;
14 unilaterally reversing "permanent" credits previously granted for unauthorized
15 transactions without reasonable and good faith basis and without advance notice to
16 the LWD Debit Cardholder; failing to extend provisional credit to LWD Debit
17 Cardholders without reasonable and good faith basis; and indefinitely freezing or
18 blocking the Accounts of LWD Debit Cardholders who call Bank of America to
19 report third-party fraud on their Accounts.[9]

20 ///

21 ///

22
23      [8] *See, e.g.*, Baker, *supra* note 9 (phone calls reporting fraud "flooded"
    Washington state unemployment benefits agency and "forced the state to hire
24  more people to answer the phones"); Andriotis *et al.*, *supra* note 9 (cardholders of
    major credit card issuers experiencing difficulty "getting customer-service
25  representatives on the phone to remove charges and replace cards").
26      [9] Kenny Choi, "Victims of Bank of America Bank Debit Card Fraud Tell
    Stories of Fake Charges, Long Waits, Closed Claims," *KPIX–CBS SF Bay Area*
27  (Dec. 22, 2020), *available at* https://sanfrancisco.cbslocal.com/2020/12/22
    /victims-of-bank-of-america-edd-debit-card-fraud-tell-stories-of-closed-claims-
28  frustration-loss/.

### 1. The Bank's Policy and Practice of Making it Difficult for Cardholders to Report Unauthorized Transactions

42.    The Bank has prevented many Plaintiff and Class Members from being able to report fraud in a timely manner, or even at all. Notwithstanding the foreseeable spike in calls that the Bank knew or should have known would inevitably accompany the dramatic increase in unemployment benefits recipients, the Bank failed to appropriately staff its customer service call centers in a manner that would enable the Bank to honor its contractual commitments under the LWD-Bank Contract and to provide reasonable levels of assistance to the predictably large volume of LWD Debit Cardholders seeking assistance during this pandemic. As a result, Plaintiff and Class Members attempting to report fraud or to inquire about potential fraud have been kept on hold for hours, have been disconnected without warning, have waited long periods of time to speak with someone only to be told to call back later, have been transferred to various departments with no apparent end or sent to voicemail, have had to deal with unhelpful automated agents, and have unsuccessfully attempted to reach the Bank by email.

### 2. The Bank's Policy and Practice of Automatically Denying Unauthorized Transaction Claims Without Reasonable Investigation or Explanation, Including Based Solely on a Highly Flawed "Claim Fraud Filter"

43.    Even when Plaintiff and Class Members have been able to report unauthorized transactions to the Bank, the Bank has had a policy and practice since at least October 2020 of automatically and summarily denying the fraud claims of LWD Debit Cardholders without adequate investigation or explanation, including based solely and exclusively on the results of the Bank's highly flawed and unreliable automated "fraud filter" ("Claim Fraud Filter"), which it applies whenever an LWD Cardholder reports an unauthorized transaction on their Account, purportedly to determine if the claimant is using a stolen identity. Pursuant to this policy and/or practice, the Bank has failed to provide provisional credit to

tens or hundreds of thousands of Cardholders who filed a fraud claim and were flagged by the Bank's Claim Fraud Filter. Instead of investigating the claim and providing provisional credit as required by law, the Bank sent those Cardholders a form letter, often dated the very same day or within a day or two of the Cardholder's report of the unauthorized transactions, closing the Cardholder's claim. The form letter states, "Your claim has been closed because we believe the account or the claim have been the subject of fraud or suspicious activity. Any temporary credit that was applied to your account related to this claim, including any related reimbursement of fees, has been or will be debited from your account and reflected in your available balance, if any." The form letter does not provide any individualized information explaining what the Bank's investigation, if any, entailed, nor does it explain the basis for the Bank's determination.

44.    The Bank's form letter provides a telephone number that Cardholders should call if they wish to "request that [the Bank] reopen your claim for further consideration," but LWD Debit Cardholders who have called the Bank at that number to make such a request have been given erroneous information or have been told they cannot be helped. Even those who have submitted detailed documentation to the Bank substantiating their fraud claims, such as sworn statements, police reports, and documentary proof of their whereabouts at the time the fraudulent transactions occurred (e.g., that they were nowhere near the ATM from which their funds were withdrawn) have been often ignored and forced to go months without receiving any update from the Bank regarding the status of their claim. Some who submitted additional information simply received yet another form letter from the Bank summarily reaffirming without explanation the Bank's original decision denying the fraud claim. Even those whose claims have been reopened were not issued provisional credit pending completion of the Bank's investigation and were not guaranteed that the Bank's investigation will be completed within a certain number of days.

45.    The Bank adopted its policy and practice of automatically denying the fraud claims of LWD Debit Cardholders in an attempt to circumvent its obligations under EFTA and Regulation E, which require the Bank to issue provisional credit if it has not completed a good-faith investigation within 10 business days of a Cardholders' report of fraud, to complete a good-faith investigation of the claim within no more than 45 days, and thereafter to issue permanent credit absent a reasonable basis for believing no fraud occurred. In implementing this unlawful policy and practice, the Bank sought to protect its own financial interests at the expense of legitimate claimants whose life-sustaining public benefits had been stolen.

46.    The Bank also implemented its policy and practice of automatically denying the fraud claims of LWD Debit Cardholders *retroactively* by rescinding "permanent" credits that the Bank had previously paid. Thus, many Plaintiff and Class Members who previously had been "permanently" credited with the amount of the funds that had been stolen from them and who had been previously informed by the Bank that their fraud claims were favorably resolved suddenly and without explanation had that same amount *debited* from their LWD Debit Card Accounts, sometimes leaving their Accounts with a negative balance. As a result, when those Cardholders received their next LWD benefits payment deposit into the LWD Debit Card Account, they were not actually able to access those benefits because the new LWD benefits payments were credited against the negative balance in their Account that resulted from the Bank's actions.

### 3.    The Bank's Policy and Practice of Automatically and Indefinitely Freezing Cardholders' Accounts When They Report Unauthorized Transactions, Based on a Highly Flawed "Claim Fraud Filter"

47.    In and around October 2020, the Bank implemented an additional policy and practice of responding to LWD Debit Cardholders who report unauthorized transactions by automatically and indefinitely freezing or blocking

their LWD Debit Card Accounts without any prior notice, explanation, or opportunity to be heard, including based solely on the results of the Bank's highly flawed and unreliable automated Claim Fraud Filter. A Cardholder whose Account is frozen or blocked cannot access any funds in their Account; moreover, the Bank will not accept LWD benefits payments from LWD for deposit into a frozen Account. Thus, many Class Members have had the experience of reporting that they were **the victims** of fraudulent transactions and receiving assurances from the Bank that it will cancel their old LWD Debit Card and issue a new one, only to discover that their new LWD Debit Card is useless because the Bank has frozen (or blocked) their LWD Debit Card Account. The Bank implements this policy and practice of freezing or blocking Accounts without any prior notice, thus depriving such Cardholder of access to any LWD benefits that may have been in the Account at the time. Moreover, the Bank's practice of freezing or blocking Accounts cuts off the affected LWD Debit Cardholders' access to any continuing benefits that the LWD deposits into the Cardholder's blocked Account or attempts to deposit into the Cardholder's frozen Account—LWD benefits to which LWD has determined the Cardholder is entitled. As a result, many LWD Debit Cardholders who are the victims of third-party fraud and who turn to the Bank for help, find themselves indefinitely deprived of access to *all* their LWD benefits and treated as if *they* are the criminals.

48.    Bank of America has frozen many Cardholders' Accounts for months on end, without providing them any information as to when their Accounts will be unfrozen or how they can facilitate that unfreezing. Some LWD Debit Cardholders whose Accounts are frozen in this manner have eventually received notice from the Bank weeks or months after the fact, but that notice simply states, "It has been determined that there may be irregular, unauthorized, or unlawful activities involved with the prepaid debit card issued to you. As a result . . . a freeze (or hold) has been placed on your account." The notice states that once the Bank freezes your

Account, you "will be unable to use the prepaid debit card or access the money in your account," and that the Account "will not be available to receive any additional benefits that may be issued to you by [LWD]." The notice further states, "If a conclusion is reached that there is no irregular, unauthorized, or unlawful activity on your account, your account will be unfrozen and your balance will become available in accordance with the terms of the card account agreement and state agency guidelines," but the notice does not advise the affected Cardholder as to what steps they can take to regain access to their Account.

49.    After Bank of America has frozen a LWD Debit Card Account in response to a report of transactional fraud, the Bank has had a policy and practice of telling LWD Debit Cardholders they are required to re-establish their identity and re-verify eligibility with LWD as a condition of unfreezing the Account—even if LWD itself has not raised any question regarding the individual's identity or benefits eligibility. Bank of America has imposed this onerous and unreasonable condition on Cardholders who report third-party transactional fraud regardless of whether there is a reasonable basis for suspecting them of having committed benefits eligibility fraud, and despite knowing that LWD's call center has been completely overwhelmed by the surge in unemployment benefits recipients throughout the pandemic and that many individuals who call LWD will never get through.

50.    Even after Cardholders have complied with this onerous and unreasonable Bank-imposed requirement of contacting LWD and obtaining confirmation from LWD that they either do not need to re-verify or have successfully re-verified their benefits eligibility, Bank of America *still* has not unfrozen their LWD Debit Card Account, continuing without explanation to deprive Cardholders of access to their LWD benefits and refusing to process their fraud claims or refund their stolen money, sometimes for months longer.

///

1
2
3

**4.    The Bank's Policy and Practice of Denying Reasonable Customer Service to Cardholders Seeking Assistance with Fraud Claims and the Unfreezing of Accounts**

4      51.    Desperate and confused, LWD Debit Cardholders whose fraud claims
5  have been summarily denied and/or whose LWD Debit Card Accounts have been
6  suddenly frozen have spent months calling the Bank's customer service hotline, to
7  no avail.

8      52.    The Bank has failed to appropriately staff its customer service call
9  centers in a manner that would allow it to honor its contractual commitments under
10  the LWD-Bank Contract and to provide reasonable levels of assistance to the
11  predictably large volume of LWD Debit Cardholders seeking assistance during this
12  pandemic. Further, the Bank has a policy and practice of failing to provide its
13  customer service representatives the tools or authority necessary to assist
14  Cardholders who call seeking assistance in resolving their fraud claims or
15  unfreezing their Accounts. Although the Bank at some point in the Fall of 2020
16  hired additional customer service agents, on information and belief those newly
17  hired customer service agents are not adequately trained and are not empowered to
18  investigate or resolve fraud claims, and the number of customer service agents
19  continued to be too low to handle incoming calls, resulting in hours-long wait times
20  if Cardholders can get through at all.

21      53.    Despite the Bank's promise of 24/7 customer service, Plaintiff and
22  Class Members have found themselves repeatedly kept on hold, sometimes for
23  hours, waiting to speak to a live agent. Plaintiff and Class Members have routinely
24  been disconnected, hung up on, and treated rudely by overworked and overwhelmed
25  agents. They often spend hours on hold with customer service, despite the Bank
26  having represented in its Cardholder Agreement that "[t]elephoning is the best way
27  of keeping your possible losses down." Even when Plaintiff and Class Members
28  finally reach customer service representatives, those representatives are unable to

offer any meaningful assistance, often conveying false information or contradicting one another.

54.    The Bank's representatives also often provide erroneous information to Plaintiff and Class Members regarding the source of their Account freezes. Countless Class Members have been told that the Bank has no control over the freeze, that LWD is the entity responsible for the freeze, and that only LWD has the power to unfreeze their LWD Debit Card Accounts. But when Class Members call LWD, LWD informs them that it has no control over their LWD Debit Card Accounts and that the freeze is entirely within the Bank's control. Even when Class Members re-verify their identity with LWD, LWD confirms their eligibility for LWD benefits, and LWD or Class Members convey this information to the Bank, the Bank *still* does not unfreeze their Accounts. In some cases, LWD has resumed paying benefits to Class Members through paper checks upon specific request by a Cardholder, but those Class Members have continued to be unable to access funds in their LWD Debit Card Accounts, which remain frozen.

55.    Bank of America's inadequate response to LWD Debit Cardholders' issues with fraud on their Cards and Accounts results from the Bank's failure to adequately staff its customer-service and fraud-investigation departments, and from Bank procedures that are designed to, or that the Bank knows or reasonably should know will, frustrate and obstruct Cardholders' efforts to submit their claims and to obtain reimbursement under EFTA and the Bank's "Zero Liability" policy.

56.    Many LWD Debit Cardholders have characterized their efforts to obtain relief from the Bank for the wrongful conduct alleged herein as an "unofficial full-time job trying to get the money back." One defrauded LWD Debit Cardholder reported: "It's kind of like a nightmare . . .. Every day I'm wondering what's more important. Do I get on the phone with the bank and try again so I have a place to

///

///

1   sleep tomorrow, or do I just accept that I'm going to be on the street and focus on
2   my job search? Because you can't do both."[10]

3   57.   A Bank of America customer service worker, addressing the Bank's
4   response to the influx of reports of third-party debit card fraud, stated: "We're
5   actually no longer allowed to tell them a timeframe, because we have no clue . . . .
6   Every day, I talk to 30 people with the same story. I just pray for them after my
7   shift, honestly."[11]

8   58.   Bank of America's disregard for LWD Debit Cardholders' issues with
9   fraud and the Bank's inadequate response contradicts the representations it made to
10  the State in its proposal to administer the LWD public benefits program, in which
11  the Bank represented, "we pride ourselves on providing stellar customer service to
12  every caller. Long call hold wait times and busy signals are not tolerated at Bank of
13  America."

14  ### 5.   The Bank's Policies and Practices Continue to Harm
15  Cardholders

16  59.   Despite the apparent issues with depending on the Claim Fraud Filter
17  as a basis for denying or closing unauthorized transaction claims or as a basis for
18  "freezing" any Class Member's Account, the Bank continues to apply the Claim
19  Fraud Filter to every Class Member who reports an unauthorized transaction and
20  continues to rely on the results of the Claim Fraud Filter as a basis for "blocking"
21  those Class Members' Accounts. Just as Class Members whose Accounts are
22  "frozen" are denied access to funds in their Accounts, Class Members whose
23  Accounts are "blocked" are likewise unable to access any LWD Benefits still
24  remaining in their Account and are unable to access any continuing LWD Benefits

25  _____

26  [10] Lauren Hepler & Stephen Council, "How Bank of America Helped Fuel
    California's Unemployment Meltdown," *CalMatters* (Nov. 20, 2020), *available at*
27  https://calmatters.org/economy/2020/11/how-bank-of-america-helped-fuel-
    California-unemployment-meltdown/.
28  [11] *Id.*

1    that LWD deposits into their Account while their Account is blocked.

2    60.    On information and belief, the Bank continues to block the Accounts

3    of thousands if not tens of thousands of Class Members *each month* based solely on

4    the results of the Bank's highly flawed and unreliable Claim Fraud Filter, thus

5    depriving Class Members of access to critical unemployment and other public

6    benefits to which the LWD has found they are entitled and on which they and their

7    families depend for food, shelter, and other basic life necessities.

8    61.    Moreover, Class Members continue to experience unauthorized

9    transactions on their LWD Debit Card Accounts.

**G.    Class Representative Plaintiff's Experiences Dealing with Bank of America's Customer Service and Trying to Obtain Reimbursement and to Unfreeze their Accounts**

13    62.    Cassandra Valerie Beaman is a New Jersey resident. In March 2020,

14    after losing her job due to the COVID-19 pandemic, she applied for and began

15    receiving unemployment benefits.

16    63.    On May 23, 2021, she experienced fraud on her account. The

17    fraudulent transactions included purchases totaling approximately $300. On May

18    23, 2021, she discovered the fraudulent transactions when she called Bank of

19    America after her card was declined. Bank of America told her a fraudulent person

20    made purchases on the account. On May 23, 2021, during the same phone call, she

21    reported the fraud to Bank of America.

22    64.    Since May 23, 2021, Bank of America has yet to credit her account for

23    any of the fraudulently stolen money. Further, on May 23, 2021, Bank of America

24    illegally froze her account. Bank of America has yet to unfreeze her account.

25    65.    Since May 2021, she has called Bank of America over twenty times.

26    Bank of America's told her she needed to re-verify her identity to gain access to her

27    account; however, when she completed this process, Bank of America still failed to

28    give her access to her account and her unemployment funds.

66.    As a direct consequence of Bank of America's actions, she missed one $200 rent payment. She missed one $60 phone bill. She struggled to afford food, gas, and clothing. She is also pregnant and suffers severe anxiety over the prospect of failing to provide for her new-born child.

## V.    CLASS ACTION ALLEGATIONS

67.    Class Representative Plaintiff bring this lawsuit individually and as a class action pursuant to Federal Rule of Civil Procedure 23, seeking declaratory and injunctive relief and damages on behalf of a class defined as follows (the "Class"):

> All persons who were Bank of America LWD Debit Cardholders at any time between January 1, 2020 and the present ("Class Period"), and whose eligibility for benefits LWD has not revoked for failure to establish valid identity.

68.    Plaintiff further seek declaratory and injunctive relief, restitution, disgorgement, and statutory and actual damages on behalf of the following Subclasses:

> **Claim Denial Subclass:** All Class Members who, during the Class Period, gave the Bank notice of a claim that an unauthorized transaction had occurred on their Account ("Claim") and whose Claim the Bank closed or denied based on application of the Claim Fraud Filter.

> **Untimely Investigation Subclass:** All Class Members who, during the Class Period, received provisional credit in connection with their claim for an unauthorized transaction that the Bank rescinded more than 45 days after the Bank received notice of the claim.

> **Credit Rescission Subclass:** All Class Members who, during the Class Period, received provisional or permanent credit from the Bank in connection with their Claim, which the Bank rescinded more than 45 days after the Class Member gave notice of the Claim.

> **Account Freeze Subclass:** All Class Members whose LWD Debit Card Account the Bank froze during the Class Period based on application of the Claim Fraud Filter and later unfroze or later converted from frozen to blocked status and then unblocked.

**Account Block Subclass:** All Class Members whose LWD Debit Card Account the Bank blocked during the Class Period based on application of the Claim Fraud Filter and later unblocked.

**Security Breach Subclass:** All Class Members whose Card, Account, or other personal information in the possession of the Bank or its agents was, during the Class Period, accessed or taken by a third party without the Class Member's consent.

**EMV Chip Subclass:** All Class Members whose LWD Debit Card, during the Class Period, did not include an EMV chip and whose Card, Account, or other personal information was accessed or taken from the Card by a third party without the Class Member's consent.

69.    Plaintiff reserves the right under Rule 23 to amend or modify the Class and Subclass descriptions and/or add one or more subclasses based on information obtained in the course of this litigation.

70.    All Class Members have suffered or are threatened with imminent injury during the Class Period, caused by Defendants' wrongful acts and omissions, as alleged herein.

71.    This action has been brought and may properly be maintained as a class action against Defendants pursuant to the following provisions of Rule 23.

a.    **Numerosity (Rule 23(a)(1))**: The members of the Class and each Subclass are so numerous that their individual joinder is impracticable. Bank of America provided hundreds of thousands of LWD benefits recipients with LWD Debit Cards that used only outdated magnetic stripe technology (no EMV chip) and subjected these individuals to an undue risk of experiencing fraudulent transactions on their LWD Debit Cards and Accounts. The identities of, and contact information for, those individuals may readily be obtained through the Bank's business records or the business records of its affiliated entities. Tens of thousands of LWD Debit Cardholders reported unauthorized transactions to the Bank and had their unauthorized transaction claims summarily closed or denied by the Bank without explanation and without issuance of provisional or permanent credit. In addition,

1  tens of thousands of LWD Debit Cardholders have had their Cards and Accounts
2  frozen or blocked by the Bank.

3      b.  **Commonality and Predominance (Rule 23(a)(2) and**
4  **23(b)(3))**: Many questions of law and fact are common to the Class and Subclasses.
5  These questions predominate over any questions affecting only individual Class
6  Members. These common legal and factual issues include, but are not limited to:

7      i.  Whether the Bank had or has a policy and/or practice of denying
8          LWD Debit Cardholders' unauthorized transaction claims
9          without having conducted a good-faith investigation that results
10          in the Bank having a reasonable basis for believing that the
11          Cardholder authorized or benefitted from the transaction,
12          including denying claims based solely on the results of the
13          Claim Fraud Filter.

14      ii.  Whether the Bank had or has a policy and/or practice of denying
15          LWD Debit Cardholders' unauthorized transaction claims
16          without providing the Cardholder with a report of the results of
17          the Bank's investigation of the claim that includes a written
18          explanation of the Bank's findings.

19      iii.  Whether the Bank had or has a policy and/or practice of not
20          provisionally or permanently crediting the Accounts of LWD
21          Debit Cardholders in the amount of an unauthorized transaction
22          claim within 10 business days of the Bank receiving notice of
23          the claim, and without having conducted a good-faith
24          investigation that results in the Bank having a reasonable basis
25          for believing that the Cardholder authorized or benefitted from
26          the transaction.

27  ///
28  ///

iv.  Whether the Bank had or has a policy and/or practice of knowingly and willfully denying LWD Debit Cardholders' unauthorized transaction claims.

v.   Whether the Bank had or has a policy and/or practice of automatically freezing the LWD Debit Card Accounts of Cardholders who report unauthorized transactions, including based solely on the results of the Claim Fraud Filter.

vi.  Whether the Bank had or has a policy and/or practice of failing to provide its customer service representatives with the training, tools, or authority necessary to reasonably assist LWD Debit Cardholders who call about resolving their unauthorized transaction claims or unfreezing their Accounts.

vii. Whether the Bank violated or is violating EFTA and Regulation E by having a policy and/or practice of denying LWD Debit Cardholders' unauthorized transaction claims without having conducted a good-faith investigation that results in the Bank having a reasonable basis for believing that the Cardholder authorized or benefitted from the transaction, including denying claims based solely on the results of the Claim Fraud Filter.

viii. Whether the Bank violated or is violating EFTA and Regulation E by having a policy and/or practice of denying LWD Debit Cardholders' unauthorized transaction claims without providing the Cardholder with a report of the results of the Bank's investigation of the claim that includes a written explanation of the Bank's findings.

ix.  Whether the Bank is violating or violated EFTA and Regulation E by having a policy and/or practice of not

provisionally or permanently crediting the Accounts of LWD Debit Cardholders in the amount of an unauthorized transaction claim within 10 business days of the Bank receiving notice of the claim, and without having conducted a good-faith investigation that results in the Bank having a reasonable basis for believing that the Cardholder authorized or benefitted from the transaction.

x.    Whether the Bank is a state actor under the "public function" test, the "joint action" test, or any other test for state action status.

xi.   Whether the Bank violated Plaintiff's and Class Members' federal or state due process rights by having a policy and/or practice of automatically and indefinitely freezing and/or blocking their LWD Debit Card Accounts, without providing them with adequate notice or an opportunity to be heard, when they report unauthorized transactions on their Accounts.

xii.  Whether the Bank owed a duty of care to Plaintiff and Class Members, including because of the fiduciary relationship between the Bank and its LWD Debit Cardholders, under the LWD-Bank Contract, under the Cardholder Agreement, or under any other contract between the Bank and Cardholders.

xiii. Whether Plaintiff and Class Members are third-party beneficiaries of the LWD-Bank Contract.

xiv.  Whether the Bank breached its duties to Plaintiff and Class Members, including by using outdated fraud-prevention technology in its LWD Debit Cards and Accounts, by not adequately monitoring LWD Debit Cards and Accounts for suspicious activity, by not conducting appropriate follow-up or

1  investigation when unauthorized transaction claims were
2  made, by failing to comply with EFTA and its own "Zero
3  Liability" policy, and by otherwise failing to make Plaintiff
4  and Class Members whole for unauthorized transactions on
5  their Accounts.

6      xv.   Whether the Bank acted negligently in its hiring, supervision,
7  and retention of TTEC and other subcontractors and agents
8  who have access to Plaintiff's and Class Members' sensitive
9  Cardholder Information.

10      xvi.   Whether TTEC was the Bank's actual, apparent, or ostensible
11  agent in its negligent hiring, supervision, and retention of
12  employees who mishandled or misappropriated Plaintiff's and
13  Class Members' sensitive Cardholder Information.

14      xvii.   Whether the Bank should be enjoined from freezing LWD
15  Debit Card Accounts or from failing to take the reasonable
16  steps necessary to avoid causing additional future harm to
17  Plaintiff and Class Members as the result of the Bank's acts
18  and omissions alleged herein.

19      xviii.   Whether the Bank should pay damages and interest or provide
20  restitution, reimbursement, and/or other relief to Plaintiff and
21  Class Members.

22      c.   **Typicality (Rule 23(a)(3))**: Class Representative Plaintiff's
23  claims are typical of the claims of the members of the putative Class. Class
24  Representative Plaintiffs, like all other members of the putative Class, sustained
25  economic and other damages as a result of the Bank's wrongful acts and omissions
26  as alleged herein. Class Representative Plaintiff and members of the putative Class
27  were and are similarly or identically harmed by the Bank's same unlawful,
28  deceptive, unfair, systematic, and pervasive pattern of misconduct as alleged herein.

1        d.    **Adequacy of Representation (Rule 23(a)(4))**:  Class

2    Representative Plaintiff will fairly and adequately represent and protect the interests

3    of the putative Class Members and have retained competent and qualified counsel

4    with extensive experience in complex litigation and class action litigation. There

5    are no material conflicts between the claims of the Class Representative Plaintiff

6    and the members of the putative Class that would make class certification

7    inappropriate. Counsel for the putative Class will vigorously prosecute the claims

8    of all putative Class Members.

9        72.    This action is properly maintained as a class action pursuant to Rule

10   23(b) of the Federal Rules of Civil Procedure for the following reasons:

11       a.    **Class Action Status (Rule 23(b)(1)):** Class action status is

12   appropriate under Rule 23(b)(1)(A) because prosecution of separate actions by each

13   of the thousands of putative Class Members would create a risk of establishing

14   incompatible standards of conduct for the Bank and inconsistent results for Class

15   Members. Class action status is also appropriate under Rule 23(b)(1)(B) because

16   prosecution of separate actions by putative Class Members would create a risk of

17   adjudication with respect to individual members of the Class that, as a practical

18   matter, would be dispositive of the interests of other members not parties to this

19   action or would substantially impair or impede their ability to protect their interests.

20       b.    **Declaratory and Injunctive Relief (Rule 23(b)(2))**:

21   Certification under Rule 23(b)(2) is appropriate because the Bank acted or refused

22   to act on grounds generally applicable to the putative Class, thereby making

23   appropriate final injunctive, declaratory, or other appropriate equitable relief with

24   respect to the putative Class as a whole.

25       c.    **Predominance and Superiority (Rule 23(b)(3))**: Certification

26   of the Subclasses under Rule 23(b)(3) is appropriate because questions of law or

27   fact common to putative Subclass Members predominate over any questions

28   affecting only individual members, and because class action treatment is superior

1    to the other available methods for the fair and efficient adjudication of this
2    controversy.

3           d.    **Issue Certification (Rule 23(c)(4))**: Certification of issues of
4    liability and statutory and treble damages under Rule 23(c)(4) is appropriate
5    because these issues are common to putative Class Members and resolution of these
6    common issues on a class-wide basis will materially advance the disposition of the
7    litigation as a whole.

8           e.    The Class and each Subclass is ascertainable from the Bank's
9    own records, and there is a well-defined community of interest in the questions of
10   law or fact alleged herein since the rights of each Class Member and each Subclass
11   Member were infringed or violated in the same or similar fashion.

12   ## VI.    CAUSES OF ACTION
13   ## FIRST CLAIM FOR RELIEF
14   ### VIOLATIONS OF THE ELECTRONIC FUND TRANSFERS ACT
15   ### (15 U.S.C. §§1693 et seq.; 12 C.F.R. §§1005.1 et seq.)

16       73.    Plaintiff repeats and incorporates by reference each and every
17   allegation set forth above, as though fully set forth here.

18       74.    Plaintiff brings this cause of action pursuant to the Electronic Fund
19   Transfers Act ("EFTA"), 15 U.S.C. §§1693 et seq., and Regulation E of EFTA, 12
20   C.F.R. §§1005.1–1005.20.

21       75.    Plaintiff and Class Members provided notice to Bank of America
22   within 60 days after Bank of America sent a period statement reflecting an
23   unauthorized transaction (which is an "error" under Regulation E) consistent with
24   15 U.S.C. §1693f and 12 C.F.R. §1005.11. As reflected (or should be reflected in
25   Bank of America's own records, absent the customer service failures alleged
26   herein), Plaintiff and Class Members provided sufficient information to identify the
27   unauthorized transaction and reasons for their belief that the transaction was
28   unauthorized.

76.    Bank of America violated 15 U.S.C. §1693f and 12 C.F.R. §1005.11, including but not limited to through its implementation of each of the following policies and/or practices:

a.    Adopting and implementing policies and practices designed to circumvent the Bank's statutory and regulatory obligations under 15 U.S.C. §1693f and Regulation E, including by frustrating and obstructing Plaintiff's and Class Members' efforts to submit unauthorized transaction claims and by denying their claims without having conducted a reasonable investigation or having a reasonable basis for believing that the Cardholder had authorized or benefitted from the transaction in question;

b.    Failing to provide provisional credit to Plaintiff and Class Members relating to error investigations that could not be resolved within 10 business days;

c.    Not issuing provisional credit to Plaintiff and Class Members within 10 business days of the Bank receiving notice the Plaintiff's or Class Member's unauthorized transaction claim, despite the Bank having no intention of conducting a good-faith investigation of the claim within 10 business days, and despite not completing a good-faith investigation of the claim within 10 business days;

d.    Failing to conduct good-faith investigations into alleged errors or unauthorized transactions that Plaintiff and Class Members timely reported to the Bank;

e.    Failing to conduct good-faith investigations into the alleged errors or unauthorized transactions within 45 days of the date that the Plaintiff or Class Member timely reported the alleged error or unauthorized transaction;

f.    Denying Plaintiff's and Class Members' claims of error without having conducted a good-faith investigation, including by denying claims based

///

solely on the results of the Bank's automated and highly unreliable and inaccurate Claim Fraud Filter;

g.     Denying Plaintiff's and Class Members' claims of error without having a reasonable basis for concluding that their Accounts were not in error, and where the Bank could not reasonably have drawn its conclusion that no error occurred based on the evidence available to the Bank at the time;

h.     Denying Plaintiff's and Class Members' claims of error without providing a report of the results of the Bank's investigation of the claim that includes a written explanation of the Bank's findings.

i.     Failing to credit Plaintiff's and Class Members' LWD Debit Card Accounts with interest on the amounts of unauthorized transactions that Bank wrongly denied, for the period during which Plaintiff and Class Members were without access to those funds;

j.     Freezing Plaintiff's and Class Members' LWD Debit Card Accounts in order to avoid the Bank's legal obligations and to prevent Plaintiff and Class Members from accessing their funds; and

k.     Unilaterally reopening claims of error long after they had already been resolved in the LWD Debit Cardholders' favor and debiting the amounts previously credited to the Cardholder's Account, without basis to do so.

77.     In situations where Bank of America has violated Regulation E by failing to provisionally credit Plaintiff's and Class Members' LWD Debit Card Accounts within 10 business days of the reported error, the Bank has neither conducted a good faith investigation nor had a reasonable basis for believing that the Account was not in error. Plaintiff and Class Members are therefore entitled to treble damages under 15 U.S.C. §1693f(e).

78.     Bank of America knowingly and willfully concluded that Plaintiff's and Class Members' LWD Debit Card Accounts were not in error when such conclusion could not reasonably have been drawn from the evidence available to

1    the Bank at the time of its investigation. Plaintiff and Class Members are therefore
2    entitled to treble damages under 15 U.S.C. §1693f(e).

3        79.    Bank of America violated EFTA and Regulation E by failing to limit
4    Plaintiff's and Class Members' liability as required by 15 U.S.C. §1693m and 12
5    C.F.R. §1005.6(b).

6        80.    Plaintiff provided notice to Bank of America less than two business
7    days after learning of the fraudulent transactions that occurred in their LWD Debit
8    Card Accounts. Under 12 C.F.R. §1005.6(b)(1), Plaintiff's and Class Members'
9    liability is capped at $50 in these circumstances. Bank of America has subjected
10   Plaintiff and Class Members to far greater than $50 in liability through its wrongful
11   conduct as alleged herein.

12       81.    Under 12 C.F.R. §1005.6(b)(2), $500 is the maximum liability that
13   may be imposed on an accountholder who does not provide notice to the financial
14   institution within two business days after learning of a suspected unauthorized
15   transaction. Bank of America has subjected Plaintiff and Class Members to far
16   greater than $500 in liability through its wrongful conduct as alleged herein.

17       82.    Regarding any Class Members who did not provide Bank of America
18   with actual notice within two business days of learning of a suspected unauthorized
19   transaction, the Bank was on constructive notice, under 12 C.F.R.
20   §1005.6(b)(5)(iii), of widespread unauthorized electronic fund transfers from LWD
21   Debit Card Accounts since the beginning of the COVID-19 pandemic. Since that
22   time, countless unauthorized fund transfers have occurred and continue to occur
23   from those Accounts. The volume of calls from LWD Debit Cardholders to the
24   Bank's customer service to report unauthorized transactions has been, and
25   continues to be, so great, and the Bank's customer service department is so
26   understaffed, that the Bank routinely causes LWD Debit Cardholders to wait on
27   hold for multiple hours. The widespread fraud specifically targeting LWD Debit
28   ///

1  Cardholders has been widely reported in the media and has been the subject of

2  significant attention from New Jersey legislators.

3      83.    In no event should any Class Member be liable for over $500 of

4  damages under 12 C.F.R. §1005.6. Bank of America has violated 12 C.F.R. §1005.6

5  by imposing hundreds and thousands of dollars of liability on unemployed New

6  Jerseyans.

7      84.    As a direct and proximate result of Bank of America violations of

8  Regulation E, Plaintiff and Class Members have lost money.

9      85.    Plaintiff, on behalf of herself and the Class, seek an injunction barring

10 Bank of America from denying provisional credit and denying fraud claims without

11 having timely conducted a good faith investigation of the alleged fraud and without

12 a reasonable basis for believing that the transaction was authorized, and barring

13 Bank of America from otherwise violating EFTA and Regulation E. Plaintiff, on

14 behalf of herself and the Fraud Claim Denial Subclass, further seek the following

15 relief: (a) actual damages with interest; (b) restitution of all LWD benefits funds

16 improperly debited by Bank of America; (c) statutory damages; (d) treble damages

17 pursuant to 15 U.S.C. §1693f(e); and (e) incidental and consequential damages

18 suffered due to their inability to pay bills or otherwise use their unemployment

19 funds.

20          **SECOND CLAIM FOR RELIEF**

21        **NEGLIGENCE AND NEGLIGENCE PER SE**

22     86.    Plaintiff repeats and incorporates by reference each and every

23 allegation set forth above, as though fully set forth here.

24     87.    Plaintiff and Bank of America have a special relationship that gives

25 rise to the Bank's duties to Plaintiff and other Class Members to act reasonably to:

26 (a) safeguard their UI and other LWD benefits; (b) protect them from fraudulent

27 access by unauthorized third parties to the funds paid into their LWD Debit Card

28 Accounts, including by timely and accurately warning them of suspicious activity

in those Accounts; (c) protect them from unreasonable interference with their right and ability to continue to collect, receive, and access the LWD benefits to which they were entitled; (d) ensure that the Bank's customer service staffing levels, technology, and operations were capable of providing Plaintiff and Class Members reasonably timely and effective customer service, including to address those customers' concerns about fraudulent or unauthorized transactions related to their LWD Debit Cards or Accounts; (e) provide Plaintiff and Class Members reasonable and adequate notice that their LWD Debit Cards and Accounts were at risk of being subject to unauthorized use or had been subjected to unauthorized use; (f) timely and adequately investigate and resolve Plaintiff's and Class Members' claims regarding unauthorized or fraudulent transactions; and (g) extend to Plaintiff and Class Members provisional credit in cases where Bank of America failed to timely resolve their fraud-related claims.

88.    Bank of America breached its duty to Plaintiff and Class Members by, among other things: (a) failing to maintain, store, share, and transmit Cardholder Information in a secure manner; (b) failing to issue Plaintiff and Class Members LWD Debit Cards with EMV chips, despite having been well aware for years of the risks associated with magnetic stripe technology; (c) failing to protect Plaintiff and Class Members from fraudulent access by unauthorized third parties to the funds paid into their LWD Debit Card Accounts, including by providing timely and accurate warnings of suspicious activity in those Accounts; (d) failing to respond to the dramatic increase in LWD benefits and LWD benefits recipients caused by or related to the COVID-19 pandemic by issuing LWD Debit Cards with EMV chips to all new and existing LWD Debit Cardholders and by taking other reasonably prudent security measures to prevent fraudulent and unauthorized transactions; (e) failing to ensure its customer service operation was capable of providing reasonably timely and effective assistance to Plaintiff and Class Members, including when they were victims of fraudulent or unauthorized transactions;

(f) failing to give reasonable and adequate notice to Plaintiff and Class Members that their LWD benefits were and remain at risk of being vulnerable to fraudulent and unauthorized transactions; (g) failing to process LWD Debit Cardholders' claims regarding fraudulent or unauthorized transactions in a reasonably timely and adequate manner, including by unreasonably automatically freezing LWD Debit Card Accounts without prior notice, reasonable investigation, or an opportunity to be heard; and (h) failing to extend provisional credit to Plaintiff and Class Members when Bank of America failed to resolve their claims regarding fraudulent or unauthorized transactions in a reasonably timely and adequate manner. Bank of America's misconduct was intended to adversely affect Plaintiff and Class Members, who rely on Bank of America to access their UI and other LWD benefits through their LWD Debit Cardholder accounts managed exclusively by Bank of America.

89.    Bank of America's misconduct concerning its failure to safeguard LWD Debit Cardholders' funds is contrary to industry standards, which prescribe using EMV chip technology in debit cards.

90.    Bank of America's misconduct concerning its failure to adequately protect Plaintiff's and Class Members' data violates its obligations under the Gramm-Leach-Bliley Act, 15 U.S.C. §§6801 et seq.; and customary industry practice, as well as its own policies and procedures for its *non*-LWD debit and credit cards and accounts, each of which are secured through EMV chip technology. Plaintiff and Class Members are within the classes of persons that each of these statutes are designed to protect, and Bank of America's conduct caused the precise harm to Plaintiff and Class Members that each of these statutes was designed to prevent.

91.    Bank of America's failure to comply with the Gramm-Leach-Bliley Act constitutes negligence per se.

92.    The harms inflicted upon Plaintiff and other Class Members were

reasonably foreseeable because the Bank was and is well aware of the security risks associated with magnetic stripe technology, and knew or should have known that its customer service resources and/or procedures were insufficient to consider, evaluate, and appropriately resolve issues stemming from the significant increase in LWD benefits and LWD benefits recipients due to the sharp rise in unemployment in the State of New Jersey caused by or related to the COVID-19 pandemic, as well as the sharp, well-publicized rise in financial fraud during the COVID-19 pandemic, both of which would foreseeably lead to an increased demand for customer service by Plaintiff and Class Members for all purposes, including for the purpose of reporting and attempting to resolve claims of fraudulent or unauthorized transactions. It was a near certainty, which the Bank knew or should have known, that Plaintiff and Class Members would suffer significant and irreparable harm as a result of the Bank's morally blameworthy actions that caused tens of thousands of unemployed New Jerseyans to lose access to past, present, and future unemployment insurance benefits for which they had been found eligible and on which they relied for their survival during the pandemic.

93.    As a direct and proximate result of Bank of America's misconduct, Plaintiff and Class Members have been deprived of their LWD benefits and have failed to receive accrued interest thereon.

## THIRD CLAIM FOR RELIEF

## NEGLIGENT HIRING, SUPERVISION AND RETENTION

94.    Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

95.    Bank of America hired various subcontractors, including but not limited to TTEC Holdings, Inc. ("TTEC"), to provide customer service, call center operations, and other services for the Bank and to perform various functions and services under the terms of the LWD-Bank Contract. These subcontractors and their employees and agents, including Customer Service Representatives, have access to

highly sensitive and confidential LWD Debit Cardholder Information, including Plaintiff's and Class Members' personally identifiable information, Card and Account data, and other financial data and information.

96.    Acting as the Bank's agent, TTEC negligently hired hundreds if not thousands of employees *en masse* to perform services for the Bank without ever conducting a background check on these individuals. Bank of America granted these unvetted agents access to LWD Debit Cardholders' highly sensitive and confidential Cardholder Information. Neither Bank of America itself nor TTEC provided proper training or supervision to these agents regarding handling and maintaining the confidentiality of Cardholder Information.

97.    Given the Bank's and TTEC's failure to conduct background checks or to take other reasonable security measures in hiring employees *en masse* to serve as Bank of America Customer Service Representatives and other Bank agents, it was reasonably foreseeable that such unvetted agents would compromise the security of Plaintiff's and Class Members' confidential Cardholder Information.

98.    Bank of America's and its subcontractors' negligent hiring, training, supervision, and retention of Customer Service Representatives and other agents who have access to highly confidential Cardholder Information harmed and continues to harm Plaintiff and Class Members by subjecting them to unreasonable risk of fraud and exfiltration of their Cardholder Information and enabled a series of internal data breaches committed by TTEC employees within the scope of their employment, which harmed the Class Members whose information was compromised.

99.    Under the terms of the LWD-Bank Contract, Bank of America is required to track and report all incidents or security breach exposures of confidential information that may have compromised an LWD Cardholder's confidential Cardholder Information or the integrity and secure delivery of LWD Benefits to the Cardholder. Bank of America thus knew or should have known that TTEC was or

became unfit or incompetent to perform the work for which it was hired, including as a result of its negligent hiring, training, supervision, and retention of agents with access to confidential Cardholder Information, yet Bank of America continued to retain TTEC as a subcontractor to perform services under the LWD-Bank Contract.

100.   TTEC at all relevant times has been the actual, apparent, and ostensible agent of Bank of America, who has ratified TTEC's actions.

101.   As a direct and proximate result of Bank of America's and its agents' misconduct, Plaintiff and Class Members have been deprived of their LWD benefits and have failed to receive accrued interest thereon.

**FOURTH CLAIM FOR RELIEF**

**BREACH OF CONTRACT**

102.   Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

103.   Each Plaintiff and Class Member entered into a Cardholder Agreement with the Bank that requires the Bank to administer LWD benefits to them through prepaid debit cards.

104.   The Cardholder Agreement provides, among other things: "Under the Bank of America 'zero liability' policy, you may incur no liability for unauthorized use of your Card up to the amount of the transaction, provided you notify us within a reasonable time of the loss or theft of your Card, Card number or PIN or its unauthorized use, subject to the following terms and conditions." The Cardholder Agreement further provides: "We will determine whether an error occurred within 10 business days after we hear from you — and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide to do this, we will credit your Account within 10 business days for the amount you think is in error, so that you will have the money during the time it takes us to complete our investigation."

105.   The Cardholder Agreement also provides that the Bank "will add funds

to your Account . . . in accordance with instructions from the LWD" and that "[f]unds are available for your use on the day we have been instructed by the LWD to fund your Account." Those also limit the circumstances under which the Bank may deprive LWD Debit Cardholders of access to their funds by freezing their LWD Debit Card Accounts. As relevant here, the Cardholder Agreement provides that if the Bank "suspect[s] irregular, unauthorized, or unlawful activities may be involved" with the Account, it may freeze the Account, but only "pending an investigation of such suspected activities."

106.   Plaintiff and Class Members performed all or substantially all of the material requirements that their Cardholder Agreement with Bank of America imposed on them, and they fulfilled all conditions precedent to Bank of America's performance, including, among other things, by contacting or attempting to contact Bank of America to reimburse them for fraudulently appropriated funds within the time specified in the Cardholder Agreement.

107.   Bank of America breached its promises to Plaintiff and Class Members in its Cardholder Agreement by, among other things: (a) failing to timely and reasonably investigate and resolve their fraud claims; (b) failing to reimburse them for unauthorized transactions; (c) failing to provide them with provisional credit when the Bank's investigation into their fraud claims exceeds 10 business days; (d) failing to limit their liability for unauthorized transactions; (e) freezing or blocking their LWD Debit Card Accounts without a reasonable basis for suspecting irregular, unauthorized, or unlawful activities in the Account, and beyond the length of time necessary for a reasonable investigation; (f) freezing or blocking their LWD Debit Card Accounts for reasons other than those specified in the Cardholder Agreement; (g) failing to make funds available to them for their use on the day the Bank has been instructed by the LWD to fund their Accounts; and (h) otherwise failing to make funds available to them in accordance with LWD's instructions.

108.   Plaintiff and Class Members were harmed by Bank of America's

1  conduct and have suffered actual damages in an amount equal to the difference in
2  the value of the banking services for which they provided valuable consideration
3  and the banking services they received.

### FIFTH CLAIM FOR RELIEF

### BREACH OF IMPLIED CONTRACT

6  109. Plaintiff repeats and incorporates by reference each and every
7  allegation set forth above, as though fully set forth here.

8  110. Bank of America agreed to and was obligated to take reasonable steps
9  to ensure that Bank's LWD Debit Card Accounts were secure against unauthorized
10 transactions and that any claims regarding unauthorized transactions were
11 adequately investigated and resolved.

12 111. All parties understood that such protections and customer service
13 obligations were integral and essential to Bank of America's business.

14 112. Bank of America was obligated to provide Plaintiff and Class
15 Members with LWD Debit Card services that were suitable for their intended
16 purpose of preserving and accessing LWD benefits as needed, rather than providing
17 debit card services that failed to take reasonable steps to safeguard their money,
18 failed to warn or notify them in the event that their LWD Debit Cards or Accounts
19 were at risk of unauthorized use, or failed to adequately investigate or resolve
20 claims regarding unauthorized transactions.

21 113. Bank of America did not take reasonable steps to protect Plaintiff's
22 and Class Members' deposited funds from unauthorized transactions or to
23 adequately investigate or resolve claims regarding unauthorized transactions. In
24 fact, Bank of America willfully violated those interests by choosing to issue LWD
25 Debit Cards with cheaper, outdated magnetic stripe technology, which it knew to
26 be uniquely vulnerable to fraud, rather than using the same EMV chip technology
27 that the Bank has included in all of its consumer credit cards and debit cards for
28 more than six years, for the express purpose of protecting against fraud.

114.   Because Bank of America failed to take reasonable steps to protect LWD Debit Cardholders' funds from being appropriated through unauthorized transactions and failed to take reasonable steps to timely or adequately respond to claims regarding unauthorized transactions, Bank of America breached its implied contracts with Plaintiff and Class Members.

115.   Bank of America's failure to fulfill its obligations to take reasonable steps to protect its LWD Debit Cardholders' funds from being appropriated through unauthorized transactions, and its failure to take reasonable steps to timely or adequately respond to claims regarding unauthorized transactions resulted in Plaintiff and Class Members receiving banking services that were of less value than they provided consideration for.

**SIXTH CLAIM FOR RELIEF**

**BREACH OF IMPLIED COVENANT OF GOOD FAITH**

**AND FAIR DEALING**

116.   Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

117.   There is a covenant of good faith and fair dealing implied in every contract and every implied contract. This implied covenant requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement. To fulfill its covenant, a party must give at least as much consideration to the interests of the other party as it gives to its own interests.

118.   The covenant of good faith and fair dealing implied in the Bank's Cardholder Agreement with Plaintiff and Class Members obligated the Bank, at a minimum: (a) to take reasonable and necessary steps to safeguard Plaintiff's and Class Members' LWD benefits, including in light of the foreseeable and actual rise in the number of LWD Debit Cardholders and the amount of financial fraud caused by or related to the COVID-19 pandemic; (b) to ensure that its customer service

operation was capable of providing reasonably adequate and effective assistance to LWD Debit Cardholders who experienced or claimed to have experienced fraud on their LWD Debit Cards or Accounts; (c) to warn or notify Plaintiff and Class Members if their public benefit funds were subject to, or at risk of being subject to, actual or suspected unauthorized use; (d) to timely and adequately investigate and resolve claims of unauthorized transactions involving Plaintiff's and Class Members' LWD Debit Cards or Accounts; (e) to extend provisional credit to Plaintiff and Class Members in cases where their fraud claims are not timely resolved; (f) to freeze or block LWD Debit Card Accounts only to protect them from third-party fraud and only for the period necessary to conduct a reasonable investigation into whether third-party fraud occurred; (g) to make LWD benefits deposited into LWD Debit Card Accounts immediately available to Cardholders and not to freeze or block Accounts without a reasonable basis for believing that the Cardholders themselves have committed fraud; and (h) to not freeze or block Accounts out of concern for the Bank's own potential liability for third-party fraud.

119.   Bank of America breached the implied covenant of good faith and fair dealing by, among other things: (a) failing to take reasonable and necessary steps to safeguard Plaintiff's and Class Members' LWD benefits, including but not limited to (i) failing to issue LWD Debit Cards with EMV chip technology, (ii) failing to secure Plaintiff's and Class Members' Cardholder Information and other sensitive personal information that could be used by third parties to effect unauthorized transactions, (iii) failing to adequately monitor for fraudulent or suspected fraudulent transactions on LWD Debit Cards and Accounts, and (iv) failing to promptly issue LWD Debit Cards with EMV chips and to increase its efforts with respect to securing personal information, fraud monitoring, and otherwise safeguarding benefits in light of the foreseeable and actual rise in the number of LWD Debit Cardholders and the amount of financial fraud caused by or related to the COVID-19 pandemic; (b) failing to ensure its customer service

CLASS COMPLAINT                                                                                           46

1  operations were capable of providing effective assistance to LWD Debit

2  Cardholders who experienced fraud on their LWD Debit Card or Account,

3  including during the COVID-19 pandemic; (c) failing to warn or notify LWD Debit

4  Cardholders that their LWD benefits were and remain subject to, or at risk of being

5  subject to, actual or suspected unauthorized use; (d) failing to timely or adequately

6  process and investigate LWD Debit Cardholders' claims regarding unauthorized

7  transactions; (e) failing to extend provisional credit in cases where LWD Debit

8  Cardholders' fraud claims are not timely resolved; (f) freezing or blocking LWD

9  Debit Card Accounts without a reasonable basis for believing that the Cardholders

10  themselves had committed fraud, and for longer than it would reasonably take to

11  investigate any such belief; (g) failing to provide LWD Debit Cardholders any

12  reasonable means of contesting the Bank's purported basis for freezing their LWD

13  Debit Card Accounts or for otherwise getting their Accounts unfrozen; and (h)

14  freezing or blocking LWD Debit Card Accounts not to protect the Cardholders, but

15  rather to protect the Bank itself, from liability for third-party fraud.

16      120.   As a direct and proximate result of Bank of America's breaches of the

17  implied covenant of good faith and fair dealing, Plaintiff and Class Members have

18  suffered actual losses and damages.

19                    **VII.   PRAYER FOR RELIEF**

20      WHEREFORE, Plaintiff, on their own behalf and on behalf of the Class, pray

21  for the following relief:

22      (1)   For an order certifying the Class and Subclasses as defined above and

23  such additional subclasses as may be appropriate, appointing Plaintiff as

24  representative for the Class, and appointing Plaintiff's counsel as counsel for the

25  Class;

26      (2)   For declaratory and preliminary and permanent injunctive relief

27  prohibiting Bank of America from engaging in the wrongful conduct alleged herein,

28  as necessary to remedy the violations alleged herein;

(3)    For an award of all recoverable compensatory, statutory, and other damages sustained by Plaintiff and the Class Members, including treble damages where authorized by law, disgorgement, unjust enrichment, restitution, a declaration that the Bank holds the Account funds in constructive trust for the benefit of Plaintiff and the Class Members, and all other available relief under applicable law, including but not limited to accrued interest for the periods during which Plaintiff and Class Members were deprived of funds in their LWD Debit Card Accounts due to unauthorized transactions;

(4)    For an award of punitive damages pursuant to applicable law;

(5)    For reasonable attorney's fees and expenses as permitted by 42 U.S.C. §1988, and any other applicable statute or law;

(6)    For taxable costs;

(7)    For pre- and post-judgment interest as allowed by law; and

(8)    For any other relief the Court deems just.

## VIII. JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: December 17, 2021          **FREEDOM LAW FIRM**

By:    *s/ George Haines*
George Haines
ghaines@freedomlegalteam.com

*Attorneys for Plaintiff &*
*The Proposed Class*


Dated: December 17, 2021          **SWIGART LAW GROUP, APC**

By:    s/ *Joshua B. Swigart*
JOSHUA B. SWIGART
Josh@SwigartLawGroup.com
*Will Apply for Pro Hac Vice*

*Attorneys for Plaintiff &*
*The Proposed Class*